WEINER, APPELLANT, *v.* CUYAHOGA COMMUNITY COLLEGE
DISTRICT ET AL., APPELLEES.

(No. 68-599—Decided July 2, 1969.)

36

*Messrs. Thompson, Hine & Flory, Mr. William H. Wallace, Mr. S. Stuart Eilers* and *Mr. Joseph S. Ruggie, Jr.,* for appellant.

*Messrs. Squire, Sanders & Dempsey, Mr. George I. Meisel* and *Mr. Wilbur J. Markstrom,* for appellees.

HERBERT, J. The issue at the heart of this dispute is whether the policies of the United States and the state of Ohio against discriminatory employment practices may be positively enforced by a public body through the medium of public improvement contracts. The public policy is clearly formulated in the legislation proscribing racial discrimination in employment. *See* Civil Rights Act of 1964, Section 2000e-2, Title 42, U. S. Code; Section 4112.02, Revised Code. Public construction contracts requiring employment in their performance must contain provisions by which the contractor promises that he will not engage in any discriminatory hiring practice (Section 153.59, Revised Code; Presidential Executive Order No. 11246, Section 202 [1], 30 Fed. Reg. 12319), but more important, both

state and federal executive orders implementing civil rights legislation enjoin upon public contractors affirmative duties with respect to seeking, hiring, training, promoting and paying employees, and in regard to their dealings with subcontractors, unions and employment agencies, all to the end that nondiscrimination in the performance of the contract will be assured. *See* Presidential Executive Order No. 11246, *supra,* Parts II and III; Ohio Gubernatorial Executive Order, June 5, 1967 (unnumbered and unreported).

Plaintiff does not question the requirement that public contractors promise not to discriminate in employment. Exacting such a promise from a contractor does little more than provide a contract remedy for practices already condemned by law. Rather, he contends that the community college district, as a public body of the state, and the federal agency, through the college (*see* Section 3354.09 [H], Revised Code), attempted to exact contractual obligations from the successful bidder which were not authorized by law.

It may be argued that requiring public contractors to take affirmative action to forestall discriminatory employment practices in the performance of their contracts will tend to raise the cost of such contracts. Increased costs impair another governmental interest, that of economy. It must be noted, however, that neither state nor federal contracts are secured only to the lowest bidder, but to the lowest *and best* bidder (Section 3354.16, Revised Code) and lowest *responsible* bidder (Section 112 [b], Title 23, U. S. Code). Moreover, the alternative of securing a like degree of compliance with equal employment opportunity laws by means of public prosecutions and administrative proceedings is also costly and, in addition, is both *post hoc* and punitive. Indeed, it might reasonably be supposed that the governmental objectives of equal employment opportunity and low-cost public construction would be better served by requiring public contractors to undertake affirmative duties in practicing nondiscrimination in their dealings with and through others in the performance of the contract, there-

by denying the benefits of public contract expenditures to those who would discriminate.

In addition to economics as a reason for requiring public contractors to assure nondiscriminatory performance, the strong moral commitment of both state and federal governments to fair employment practices is reflected in their respective legislation. A government which has declared discriminatory employment practices unlawful should not then finance them indirectly by binding only its direct contractor, and not the entire contract performance, to a promise of attempted compliance. We conclude that the capacity to assure a performance which complies with antidiscrimination laws is reasonably a part of the standard of a best or responsible bidder on a contract involving the expenditure of public funds. Accordingly, a bidder for a construction contract to be awarded by a public body of this state may be required to assure, by appropriate promises contained in contract provisions or related instruments, nondiscrimination in employment in the entire performance of the contract.

The remaining issue is the propriety of the particular promise sought in this case.

Plaintiff contends that a *guarantee* of *Negro* employment was sought. The only use of those terms occurred in Reliance's negation of what it could assure. The factual determinations of both of the courts below are that neither the invitation to bid nor the negotiations with respect to Affirmative Action Plans were directed at securing either an absolute guarantee of the actual results of such a plan or a result pertaining solely to Negroes. The establishment of a quota of employment of any particular minority would also be discriminatory in violation of the Civil Rights Act of 1964 (Section 2000e-2 [j], Title 42, U. S. Code). It is no answer that the successful bidder promised Negro representation on the job. The record contains no evidence that such a promise was either required or solicited, or that the promise would be enforced to the exclusion of all other persons. The findings of the courts below are supported by the record and we are

not disposed to disturb them from this distance. *See Radecki* v. *Lammers* (1968), 15 Ohio St. 2d 101, 102, 238 N. E. 2d 545; Section 2505.31, Revised Code.

The courts below also found that what was sought was an unequivocal statement by the contractor which would assure equal employment *opportunity,* and that Reliance's posture throughout the discussions included only equivocal assurances. The record supports the conclusion that all parties to the bid understood what was required by the federal government through the college, but that Reliance found itself in the position of being willing but unable to make a contractual commitment of full nondiscriminatory performance. We have determined that such a commitment may validly be exacted and, therefore, Reliance's bid was lawfully rejected.

It is unfortunate that Reliance, whose submitted Affirmative Action Plan reflected the company's equal opportunity employment practices, should have lost this contract for failure to satisfy the government that racial discrimination would not be practiced. However, it must be remembered that while the public entity was interested in Reliance's compliance with the letter and spirit of fair employment laws, it was also vitally concerned that the entire job be conducted in compliance with such laws. Toward this end, it properly sought the prime contractor's unequivocal assurance that it would deal with others involved in the performance in a manner which would secure such compliance, and was entitled to judge the best or responsible bidder accordingly.

The record supports the findings and conclusion that defendants did not abuse their discretion in rejecting the low bid of Reliance and awarding the contract to the second bidder. The judgment of the Court of Appeals is therefore affirmed.

*Judgment affirmed.*

MATTHIAS, O'NEILL, SCHNEIDER and DUNCAN, JJ., concur.

TAFT, C. J., dissenting. As stated in the majority's statement of the case, "the invitation for bids on the contract contained specifications which required the contractor to submit an *Affirmative Action Plan* intended to 'have the *result of assuring* that there is minority group representation in all trades on the job and in all phases of the work'" and "Reliance's bid was formally rejected by the College for failure to include submission of" such a plan.

I fail to perceive any distinction between such a "Plan intended to 'have the *result of assuring* * * * minority group representation'" and a guarantee of such representation. Counsel for the College conceded that such a guarantee would be a discrimination against others that is prohibited by the Civil Rights Act of 1964 (Section 2000e-2 [j], Title 42, U. S. Code).

Likewise, the majority opinion concedes that "the establishment of a quota of employment of any particular minority would * * * be discriminatory in violation of" that Act. Certainly, such an unlawful establishment of a quota would necessarily be a part of any "*Affirmative Action Plan* intended to 'have the *result of assuring* that there is minority group representation in all trades on the job and in all phases of the work.'"

GRAY, J., concurs in the foregoing dissenting opinion.

GRAY, J., of the Fourth Appellate District, sitting for ZIMMERMAN, J. Because of the inability, "by reason of illness," of JUSTICE CHARLES B. ZIMMERMAN "to hear, consider and decide" this cause, JUDGE GRAY of the Court of Appeals was, pursuant to Section 2 of Article IV of the Constitution of Ohio, duly directed by the Chief Justice "to sit with the justices of the Supreme Court in the place and stead of" JUSTICE ZIMMERMAN, and JUDGE GRAY did so and heard and considered this cause prior to the decease of JUSTICE ZIMMERMAN on June 5, 1969.