471 F.2d 680
 5 Fair Empl.Prac.Cas. 229, 5 Empl. Prac. Dec. P 8085
SOUTHERN ILLINOIS BUILDERS ASSOCIATION et al., Plaintiffs-Appellees,
v.
Richard B. OGILVIE, Governor, State of Illinois, et al.,
Defendants-Appellees, and Operative Plasterers and Cement
Masons International Association, Local 90, AFL-CIO, et al.,
Defendants-Appellants, and United States of America,
Intervenor-Appellee.
 No. 71-1771.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 20, 1972.
Decided Dec. 1, 1972.
 
 Harold Gruenberg, St. Louis, Mo., for appellants.
 Edward L. Welch, E. St. Louis, Ill., J. Leonard Schermer and Lawrence P. Kaplan, St. Louis, Mo., Edward Neville, E. St. Louis, Ill., Wm. J. Scott, Atty. Gen., and James M. Winning and William P. Ryan, Springfield, Ill., for appellees.
 David L. Norman, Asst. Atty. Gen., and David L. Rose, Andrew J. Ruzicho, and Gerald F. George, Dept. of Justice, Washington, D. C., Donald B. Mackay, U. S. Atty., and Gregory M. Wilson, Springfield, Ill., for intervenor-appellee.
 Before DUFFY, Senior Circuit Judge, and CUMMINGS and SPRECHER, Circuit Judges.
 SPRECHER, Circuit Judge.
 
 
 1
 This appeal tests the constitutionality of a plan intended to implement equal employment opportunities in the highway construction industry in Madison and St. Clair Counties, Illinois.
 
 
 2
 * After the United States Department of Transportation had ordered all federal funds for highway construction in Madison and St. Clair Counties withheld for lack of equal employment opportunities, the six principal craft unions involved in highway construction (teamsters, laborers, carpenters, cement masons, ironworkers and operating engineers) met with federal and state officials and representatives of highway contractors and subcontractors and of the black community, in an attempt to thaw the frozen funds. With very little help and considerable opposition from the unions, the governor of Illinois promulgated on June 3, 1970, "An Agreement to Facilitate Equal Employment Opportunity in Madison and St. Clair Counties" (Ogilvie Plan).
 
 
 3
 The plan provided a program for the recruitment, placement and training of minority group members in the highway construction industry. Minority group members who had worked as journeymen "under permit" for at least one year were to be considered as qualified journeymen by the contractors, who were to make every opportunity to employ them. Minority applicants who did not qualify as journeymen were eligible to participate in an orientation course, followed by a specified number of hours of training in a selected craft. After successfully completing training and testing, the trainees were given journeymen status. Those trainees not deemed equivalent in skill for journeyman status were to be hired by contractors for up to 200 days of on-the-job advanced training at wages of from 60 to 90 percent of the journeyman's rate for the particular craft involved. Upon completion of the advanced training, the trainees were to become full-fledged journeymen and to receive a journeyman's wage.
 
 
 4
 The plan was to be carried out by a local Equal Opportunity Administrative Committee consisting of two contractor representatives, two representatives of the Metro-East Labor Council, Inc., two members appointed by the governor and appropriate representation by every labor union becoming a party to the agreement. The plan provided "[t]he Committee shall determine the ratio of Advanced Trainees to journeymen for each craft, provided that the minimum ratio be one Advance Trainee to four journeymen."[1]
 
 
 5
 The Ogilvie Plan was signed and executed by the Southern Builders Association, whose members are contractors in Madison and St. Clair Counties, and by the Metro-East Labor Council, Inc., an organization of representatives of the black community in the two counties. Two teamster local unions signed an "Addendum" to the plan and agreed to its implementation. The laborers acquiesced in its implementation. Shortly following the execution of the Ogilvie Plan, highway construction in the two counties resumed.
 
 
 6
 The United States had filed four separate suits against the cement masons, ironworkers, operating engineers and carpenters to enforce the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. and to prevent interference with Executive Order 11246.[2] Consent decrees were entered in the operating engineers' case on May 13, 1969,[3] in the cement masons' case on May 6, 1970,[4] and in the ironworkers' case on November 13, 1970,[5] requiring the three appellant unions in the present case to cooperate in the implementation of training programs sponsored by the government or the contractors' association, both of which sponsored the Ogilvie Plan. United States v. United Brotherhood of Carpenters and Joiners, Local 169, 457 F.2d 210 (7th Cir. 1972), cert. denied, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972).
 
 
 7
 Despite the provisions of the consent decrees providing for cooperation with plans such as the Ogilvie Plan and for the referral of trainees, the three appellant unions have contended they are not obligated to refer trainees and have refused contractor requests for trainees and otherwise failed to cooperate with the plan on the grounds that such referrals would violate the terms of their collective bargaining agreements with the contractors and in part their consent decrees with the United States and that the plan itself is unlawful and unconstitutional. Consequently on January 29, 1971, the Southern Illinois Builders Association and Southern Illinois Contractors Association brought an action for declaratory judgment seeking judicial interpretation of the Ogilvie Plan and certain aspects of its implementation in view of the consent decrees and the unions' collective bargaining agreements.
 
 
 8
 The district court, after a full trial, issued its declaratory judgment on May 7, 1971, holding that the Ogilvie Plan was not violative of any constitutional provision nor of the Civil Rights Act of 1964; that the plan was not inconsistent with the unions' consent decrees with the United States; that the decrees required the unions to cooperate in the implementation of the plan; that to the extent the plan may be inconsistent with collective bargaining agreements, the plan should prevail because of the requirements of the consent decrees and Executive Order 11246; that the State of Illinois and its officials had the right to enforce compliance with the plan; and that the contractors through their association and the Metro-East Labor Council, Inc. were obligated to comply with the plan. Southern Illinois Builders Association v. Ogilvie, 327 F.Supp. 1154 (S.D.Ill.1971).[6]
 
 
 9
 On June 2, 1971, after a further hearing, the district court denied the motions of the three appellant unions for a new trial and issued an amended order interpreting three specific provisions of the Ogilvie Plan as follows (327 F.Supp. at 1164):
 
 
 10
 "(2) The sequential hiring pattern of trainees or minority group individuals in the Kronst memorandum of January 12, 1971 is not prohibited nor required by the Ogilvie Plan.[7]
 
 
 11
 "(3) The intent of the Ogilvie Plan in establishing its minimum ratios is to require referral and employment of minority group individuals on a craftwide basis in highway construction, in the aggregate, throughout the jurisdictional area covered by the Ogilvie Plan, and not to require referral employment of minority group individuals in a fixed ratio on any particular job site.
 
 
 12
 "(4) The terms and provisions of the Ogilvie Plan do not require the contractors to employ more individuals than are needed to perform any job according to the terms of the collective bargaining agreements between the unions and the contractors."
 
 
 13
 The three unions have appealed from the declaratory judgment as amended. We affirm.
 
 II
 
 14
 The appellant unions have argued that the Ogilvie Plan, by establishing a ratio of trainees to journeymen for employment on highway construction, has established a quota system for hiring in contravention of Title VII of the Civil Rights Act of 1964 and the Fifth and Fourteenth Amendments to the Constitution.
 
 
 15
 We will not repeat the demographic background of the Ogilvie Plan, which led us to conclude in United States v. United Brotherhood of Carpenters and Joiners, Local 169, supra, 457 F.2d at 214-216, that a history of discrimination existed in the highway construction trades in Madison and St. Clair Counties.[8]
 
 
 16
 Section 22(a) of the Federal Aid Highway Act of 1968 (23 U.S.C. Sec. 140) requires the State of Illinois to adopt the Ogilvie Plan or one substantially like it with apprenticeship, skill improvement or other upgrading programs without regard to race, color, creed or national origin, in order to participate in Federal-aid highway construction programs. Executive Order 11246, Sept. 24, 1965, as amended by Executive Order No. 11375, Oct. 13, 1967, 32 F.R. 14303, requires contractors desiring to participate in Federal-aid programs to take "affirmative action" in regard to equal opportunity employment, upgrading, recruitment and selection for training, including apprenticeship.
 
 
 17
 The obligation to take affirmative action imports more than the negative obligation not to discriminate. The Secretary of Labor is responsible for the administration of Executive Order 11246 and is authorized to "adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof" (Sec. 201). The Secretary's regulations require that contractors develop written affirmative action plans which shall "provide in detail for specific steps to guarantee equal employment opportunity keyed to the problems and needs of members of minority groups, including, when there are deficiencies, the development of specific goals and time tables for the prompt achievement of full and equal employment opportunity." 41 C.F.R. 60-1.40 (a) (1970).
 
 
 18
 The two pilot plans utilizing the goals-and-time-tables concept were the Cleveland and Philadelphia plans for the construction industry,[9] which led to the establishment of some 50 other geographic-area plans.[10]
 
 
 19
 In litigation arising out of the Cleveland plan, the Supreme Court of Ohio upheld the validity of an affirmative action plan intended to "have the result of assuring that there is minority group representation in all trades on the job and in all phases of the work" on the ground that "factual determinations of both of the courts below are that neither the invitation to bid nor the negotiations . . . were directed at securing either an absolute guarantee of the actual results of such a plan or a result pertaining solely to Negroes." Weiner v. Cuyahoga Community College District, 19 Ohio St.2d 35, 249 N.E.2d 907, 908, 910 (1969), cert. denied, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970).
 
 
 20
 The Philadelphia plan required that a contractor in his proposal set specific goals for minority group hiring within certain skilled trades, which goals must be within the range previously determined by the Secretary of Labor (accelerated over a four-year period up to 19 to 26%) and that he must make "every good faith effort" to meet those goals. In upholding the validity of the Philadelphia plan against attacks based, as here, on Section 703 of Title VII of the Civil Rights Act of 1964[11] and the due process clause, the Court of Appeals for the Third Circuit found the plan to be valid action "to remedy the perceived evil that minority tradesmen have not been included in the labor pool available for the performance of construction projects in which the federal government has a cost and performance interest." Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159, 177 (3rd Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971).[12]
 
 
 21
 The validity of the Newark plan was upheld against contentions that it set up impermissible quotas in Joyce v. McCrane, 320 F.Supp. 1284 (D.N.J.1970).
 
 
 22
 Another line of authority involves actions brought by the Attorney General or aggrieved individuals seeking relief against labor unions for violation of Title VII of the Civil Rights Act of 1964 where the union's defense was that to change its practices would result in the establishment of an unlawful quota system or preferential treatment of blacks. These defenses have uniformly been held to be lacking in merit. Local 53 of Int. Ass'n of Heat & Frost Insulators & Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969) (affirmed district court's ordering of chronological referrals for work with alternating white and black referrals until objective membership criteria are developed); United States v. International Brotherhood of Electrical Workers, Local No. 38, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970), (remanded to district court with instructions to enter specific order, and to retain jurisdiction, to eliminate "ingrained discriminatory practices of past decades"); United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971) (affirmed district court's ordering sufficient black trainees and apprentices to meet judicially imposed ceiling requirements). Affirmative action plans promulgated by the courts are part of the courts' power and duty to eliminate the vestiges of past discrimination. United States v. United Brotherhood of Carpenters & Joiners, Local 169, supra, 457 F.2d at 216.
 
 
 23
 The appellant unions seek to distinguish these cases on the general ground that they imposed a more or less flexible ratio and that the Ogilvie Plan's ratio is relatively inflexible.
 
 
 24
 In United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969), a school desegregation case, the district court had set as a goal a plan of faculty assignment of at least two black teachers out of each 12 in any given school. The Court of Appeals modified the order by eliminating what it regarded as "fixed mathematical" ratios of faculty and substituted a "substantially or approximately" five-to-one ratio. The Supreme Court reversed the Court of Appeals and restored the district court's order in its entirety, "accepting the more specific and expeditious order of Judge Johnson, whose patience and wisdom are written for all to see and read on the pages of the five-year record before us." Id. at 235-236, 89 S.Ct. at 1676. The court added that in fact Judge Johnson himself prevented absolute rigidity or inflexibility by amending his orders from time to time and retaining on-going jurisdiction to meet necessities as they arose.
 
 
 25
 In Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), the Court expressly rejected the contention that teachers be assigned on a "color blind" basis, held that the Constitution permits district courts using their equity power to order assignment of teachers to achieve a particular degree of faculty desegregation, and quoted extensively the above portions of Montgomery. Id. at 19, 91 S.Ct. 1267.
 
 
 26
 The Ogilvie Plan is to remain in effect for a period of only three years from June 3, 1970. Judge Poos has retained jurisdiction "for such period as the Ogilvie Plan remains in effect, for such further relief as may be necessary or appropriate to effectuate the implementation of the Ogilvie Plan." His amended order of June 2, 1971, interpreted the plan liberally and flexibly to meet contingencies as they arose. We conclude that the plan as implemented and interpreted by the district court constitutionally and lawfully attempts to eliminate past discrimination.[13] The plan does not impermissibly prefer black persons nor does it discriminate against white persons.[14]
 
 
 27
 In this case, we believe that "numerical objectives may be the only feasible mechanism for defining with any clarity the obligation of federal contractors to move employment practices in the direction of true neutrality." Note, "Developments in the Law-Employment Discrimination and Title VII of the Civil Rights Act of 1964," 84 Harv.L.Rev. 1109, 1304 (1971).
 
 III
 
 28
 Having determined the validity of the Ogilvie Plan, we find the remaining arguments of the unions unimpressive. They first argue that the plan "constitutes an invalid intrusion by the State of Illinois . . . into the federally preempted area of collective bargaining and labor dispute adjustment." They further argue that the plan conflicts with the parties' collective bargaining agreement and with the consent decrees.
 
 
 29
 Since the action of the State of Illinois was properly taken to effectuate compliance with federal statutes and directives, including Executive Order 11246 and Section 22a of the Federal Aid Highway Act of 1968, we fail to see how it unlawfully intrudes into a federally preempted area. We agree with the Third Circuit that "[i]f the Plan violates neither the Constitution nor federal law, the fact that its contractual provisions may be at variance with other contractual undertakings of the contractor is legally irrevelant."[15] The consent decrees do not stand in the way of the plan but instead compel the appellant unions to cooperate with it.
 
 
 30
 Finally, we conclude that Judge Poos patiently and exhaustively heard all of the parties, that his interpretation and implementation of the plan was based upon his intimate knowledge of the whole situation, and that his judgment as amended was not clearly erroneous and should stand.
 
 
 31
 Affirmed.
 
 
 
 [1]
 It further provided: "It is agreed that Advanced Trainees in each craft will be employed in the geographical area of this agreement in the same ratio as the number of Advanced Trainees to journeymen in that craft. The contractors will make every good faith effort to assure the same employment ratio of Advanced Trainees to journeymen in employment for each union on each construction job within the geographical area of this Agreement."
 
 
 [2]
 The suits against the cement finishers and operating engineers were filed on January 17, 1969, the suit against the ironworkers was filed on June 2, 1970, and that against the carpenters was filed on November 25, 1970
 
 
 [3]
 "[Operating Engineers Local 520] shall cooperate with any contractor or contractors' association which is party to its collective bargaining agreement, joint committee comprised in part of representatives of Local 520, or government agency in the establishment and operation of any apprenticeship, skill improvement, or on-the-job training programs in the crafts under the jurisdiction of Local 520, and defendants shall exercise all efforts to see that such programs are operated in a nondiscriminatory manner." United States v. International Union of Operating Engineers, No. C-69-9 (E.D.Ill.1969)
 
 
 [4]
 "[Cement Masons] Local 90 shall cooperate with any contractor or contractors' association which is party to its collective bargaining agreement or government agency in the establishment and operation of any training program in the crafts under its jurisdiction. Specifically, Local 90 shall cooperate with the State of Illinois' Plan to Facilitate Equal Employment Opportunity in State Highway Construction in Madison and St. Clair Counties (Ogilvie Plan). Such cooperation need not include sponsorship of or the operation of such Plan or program but participants in and graduates of the Plan or program shall be eligible for referral and membership as provided in Paragraphs 4, 10 and 16 of this decree." United States v. The Operative Plasterers and Cement Masons International Assn., Local No. 90, No. C-69-11 (E.D.Ill.1970)
 
 
 [5]
 "[Ironworkers] Local 392 shall cooperate with any contractor or contractors' association which is party to its collective bargaining agreement and government agency in the operation of any training program established in the crafts under its jurisdiction. Such cooperation need not include sponsorship of or the operation of such Plan or program but participants in and graduates of such training program operated by government agencies shall be eligible for referral and membership as provided in Paragraphs 4, 10 and 16 of this decree." United States v. The International Assn. of Bridge, Structural and Ornamental Iron Workers, Local Union No. 372, No. C-70-78 (E.D.Ill.1970)
 
 
 [6]
 In its opinion, the court said at 1159:
 "The Ogilvie Plan is a realistic plan which realistically promises to work immediately. It provides a starting point by assuring that certain minorities are provided an equal employment opportunity."
 
 
 [7]
 District Engineer R. E. Kronst of the Illinois Division of Highways had issued a memorandum dated January 12, 1971, specifying a hiring sequence for each craft on each highway construction job site of two journeymen, one trainee, two journeymen, one trainee, four journeymen and then repeat the sequence
 
 
 [8]
 The record in that case applied to two carpenter unions. The same pattern is shown in this case in regard to the three appellant unions in 1968:
 Journeymen Apprentices
 ------------ -------------
 White Black White Black
 ----- ----- ------ -----
Operating Engineers 1124 0 0 0
Ironworkers 480 0 23 0
Cement Masons 277 1 14 0
 
 
 [9]
 Nash, "Affirmative Action Under Executive Order 11246," 46 N.Y.U.L.Rev. 225, 233 (1971)
 
 
 [10]
 New York Times, September 19, 1972, p. 49
 
 
 [11]
 Sec. 703(a) makes it an unlawful employment practice to discriminate against any individual or to classify employees in regard to employment conditions and opportunities. Sec. 703(j) provides that nothing in Title VII shall require any employer to grant preferential treatment to any individual or group. 42 U.S.C. Sec. 2000e-2(a) and (j)
 
 
 [12]
 As here, the Philadelphia plan was "color-conscious." The Court said at 442 F.2d 173: "Clearly the Philadelphia Plan is color-conscious. Indeed the only meaning which can be attributed to the 'affirmative action' language which since March of 1961 has been included in successive Executive Orders is that Government contractors must be color-conscious."
 
 
 [13]
 The Court of Appeals for the Eighth Circuit has recently approved upon rehearing en banc a hiring of "Black, American-Indian or Spanish-surnamed-American applicants" for one out of every three Minneapolis fire fighter vacancies in order to erase the effects of past racially discriminatory practices. Carter v. Gallagher, 452 F.2d 315, 330-331 (8th Cir.), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972)
 
 
 [14]
 The unions also argued that the ratio of trainees to journeymen discriminates in favor of black persons and against "other minority group" persons. In the first place, the Ogilvie Plan does not restrict trainees to any particular minority group. The plan provides "[t]he final responsibility for the recruitment of minority group residents of the area shall rest with the Metro-East Labor Council, Inc." (Sec. IV, par. 1). "All minority group members who reside within the two-county area and who have worked as journeymen 'under permit' for at least one year shall be considered as qualified journeymen by the contractors . . ." (Sec. V, par. 1). "All minority applicants who believe that their previous experience qualifies them to work at journeymen's rates shall appear before this [Craft Selection] Sub-Committee" (Sec. V, par. 2). "All applicants who do not qualify as journeymen . . . shall be afforded the opportunity to enter a training program . . . (Sec. VI, par. 1)
 In the second place, the principal drafter of the plan testified that "[m]y understanding of what is meant by minority group members is the common usage . . . meaning blacks, Orientals, browns, meaning Spanish-Americans and American Indians. . . ." The fact that all trainees up to the time of the hearing had been black applicants is not strange since the population of East St. Louis is approximately 70% black and St. Clair County is 22% black. United States v. United Brotherhood of Carpenters, supra, 457 F.2d at 214 (7th Cir. 1972). There is no evidence or finding that minority groups other than blacks have been under-utilized in the construction industry in that area or that exclusionary tactics have been practiced against such minority groups.
 
 
 [15]
 Contractors Association of Eastern Pennsylvania v. Secretary of Labor, supra, 442 F.2d at 174. The court continued: "Factually, of course, that variance is quite relevant. Factually it is entirely likely that the economics of the marketplace will produce an accommodation between the contract provisions desired by the unions and those desired by the source of the funds. Such an accommodation will be no violation of the National Labor Relations Act."