**SCHINDLER ELEVATOR CORPORATION and Construction Concepts, Inc., Appellants–Plaintiffs,**

v.

**METROPOLITAN DEVELOPMENT COMMISSION, Consolidated City of Indianapolis and Montgomery Elevator Co., Appellees–Defendants.**

No. 49A05–9310–CV–372.

Court of Appeals of Indiana, Fifth District.

Oct. 20, 1994.

Mark R. Waterfill, Janet D. Neuenschwander, Leagre & Barnes, Indianapolis, for appellant.

Robert J. Hoffman, Richard S. Pitts, Lowe Gray Steele & Hoffman, Alan K. Mills, Ann C. McGown, Barnes & Thornburg, Indianapolis, for appellee.

## OPINION

SHARPNACK, Chief Judge.

Schindler Elevator Corporation and Construction Concepts, Inc. (collectively "Schindler") appeal from the trial court's adverse judgment in Schindler's suit against the Metropolitan Development Commission ("the Commission"), the Consolidated City of Indianapolis ("the City"), and Montgomery Elevator Company ("Montgomery"). Schindler initiated this action after the Commission awarded the contract for the Circle Centre Development Project, Mall Vertical Transportation Project ("the Project") to Montgomery. We affirm.

Schindler raises two issues on appeal, only one of which we need to address. Restated, that issue is whether the trial court erred in finding that the Commission complied with Indiana's public bidding laws in awarding the Project contract to Montgomery as the lowest responsible and responsive bidder.

Schindler and Montgomery are contractors in the business of manufacturing, supplying, installing, and maintaining elevators and escalators.[1] DeMars Program Management ("DeMars") was engaged by the City to assist in various aspects of the Circle Centre Mall project, and to compile, develop, and publish the Project's bid specifications, as well as to evaluate bids. The City, through the Department of Metropolitan Development ("DMD"), published its contract documents and specifications for the Project ("the Project Manual"). The Project Manual informed bidders that a pre-bid meeting would be held on April 27, 1993, and that bids for the Project would be opened on May 6, 1993. On April 27th, representatives of Schindler, Montgomery, Otis Elevator Company ("Otis"), and others attended the pre-bid meeting. Subsequently, Schindler, Montgomery, and Otis each submitted a bid on the Project to the City's Central Purchasing Division ("Central Purchasing"). On May 6th, the three bids were opened publicly and the base bid amount listed by each bidder was read aloud: Schindler, $3,338,000; Otis, $3,161,443; Montgomery, $2,399,000. Central Purchasing, the City's Division of Equal Opportunity ("DEO"), and DeMars reviewed each bid. Based on these evaluations, Montgomery was determined to be the apparent lowest responsible and responsive bidder.

On May 11, 1993, Schindler sent a letter to the DMD's project manager for the Circle Centre Mall in which Schindler argued that the bids from Montgomery and Otis were not responsive and protested any award to Montgomery, the apparent low bidder. On June 2, 1993, the Commission adopted a resolution awarding the contract for the Project to Montgomery. On June 11, 1993, Schindler sent a letter to the Commission in which Schindler protested the award of the Project contract to Montgomery. On June 16, 1993, Schindler's counsel sent a third protest letter to the Commission and the City's Legal Department. On June 17, 1993, the purchase order for the contract and a notice to proceed were issued.

---

1. Construction Concepts, Inc. is an Indiana corporation which has been certified by the City's Division of Equal Opportunity as a minority business enterprise ("MBE") engaged in general contracting construction work. Construction Concepts was designated as an MBE subcontractor on the "Schedule of MBE/WBE Participation" submitted as a part of Schindler's bid.

Thereafter, on June 30, 1993, Schindler filed its five-count complaint seeking damages and injunctive relief. Schindler's complaint sought relief based on: the alleged violation of Indiana's public bidding laws; breach of contract; promissory estoppel; a taxpayer's public lawsuit seeking redress for the Commission and City's alleged favoritism, bias, arbitrary and capricious conduct, fraud, and constructive fraud; and unlawful scheme, contract, or combination in restraint of trade and preventing competition. The Commission and the City filed their answer on July 30, 1993. Montgomery filed its answer on August 2, 1993, along with a counterclaim for reasonable expenses and attorney's fees incurred in defending the suit. Schindler filed an amended complaint on August 12, 1993.

The trial on the merits was advanced and consolidated with the hearing on Schindler's request for a preliminary injunction. The Commission and the City filed a request for findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52, and a bench trial was conducted August 17–19, 1993. At the close of Schindler's case, the defendants moved for involuntary dismissal pursuant to T.R. 41(B). The trial court granted the defendants' motions for involuntary dismissal as to counts II (breach of contract) and V (unlawful restraint of trade) of Schindler's amended complaint. On September 14, 1993, the trial court entered its findings of fact, conclusions thereon, and judgment in favor of defendants on the remaining counts in Schindler's amended complaint, and in favor of Schindler on Montgomery's counterclaim. Additional facts will be provided as required for discussion of the issues presented on appeal.[2]

The issue on appeal is whether the trial court erred in finding that the Commission complied with Indiana's public bidding laws in awarding the Project contract to Montgomery as the lowest responsible and responsive bidder.

Schindler contends that Indiana's competitive bidding laws were violated because Montgomery's bid was not responsive as required by I.C. § 36–1–12–4(b)(8)(A) and the City unlawfully allowed Montgomery to supplement its bid after the bid opening. Schindler alleges that although Montgomery's bid reflected the lowest bid amount, it contained material variances with regard to requirements for minority business enterprise/women business enterprise ("MBE/WBE") participation, the submission of an affirmative action plan, the inclusion of a bid bond in an amount equalling at least five percent of the bid amount, and the submission of a properly completed "Invitation to Bid" form. We will address each of these allegations in turn.

Because we are reviewing a decision of public body vested with the power to award contracts for public work, we are guided by the following standard of review:

"Judicial review of decisions of a public agency is limited. *Bowen Engineering Corp. v. W.P.M., Inc.* (1990), Ind.App., 557 N.E.2d 1358. A reviewing court will not substitute its judgment for that of the awarding body, but will reverse only when the challenged determination is clearly arbitrary, illegal, corrupt or fraudulent. *Id.* Where a board is vested with discretionary power to enter into public contracts pursuant to the competitive bidding ... an honest exercise of such discretion will not be disturbed by the courts. *Budd v. Board of Commissioners of St. Joseph County* (1939), 216 Ind. 35, 22 N.E.2d 973; *Metropolitan School District of Martinsville v. Mason* (1983), Ind.App., 451 N.E.2d 349. An arbitrary and capricious administrative

---

2. Through their submission of supplemental authority, the Commission and the City refer us to *Shook Heavy and Environmental Construction Group v. City of Kokomo* (1994), Ind., 632 N.E.2d 355, for the proposition that a disappointed bidder on a public work project has no common law cause of action. *See also All–Star Construction and Excavating, Inc. v. Board of Public Works and City of Kendallville* (1994), Ind., 640 N.E.2d 369. In *Shook*, the supreme court wrote, however, that an unsuccessful bidder could challenge the award of a contract pursuant to I.C. § 34–4–17–3 or I.C. § 24–1–2–7 if, "in the first case, the unsuccessful bidder was a citizen or taxpayer of the municipality or, in the second case, the unsuccessful bidder alleged collusion or fraud." *Shook,* 632 N.E.2d 355, 358. In the present case, Schindler and Construction Concepts brought this action based in part on their status as Marion County taxpayers and alleged and attempted to prove collusion and fraud.

act is one which is willful and unreasonable, without consideration and in disregard of facts or circumstances in the case; the act is one without some basis which would lead a reasonable and honest person to the same conclusion."

*Irwin R. Evens & Son, Inc. v. Board of the Indianapolis Airport Authority* (1992), Ind. App., 584 N.E.2d 576, 585.

█ Indiana Code § 36–1–12–4 sets forth certain procedures to be followed in awarding public work contracts. It provides, in pertinent part:

"(8) [T]he board shall:

(A) Award the contract for public work or improvements to the lowest responsible and responsive bidder; or

(B) Reject all bids submitted.

*         *         *         *         *         *

(10) In determining whether a bidder is responsive, the board may consider the following factors:

(A) Whether the bidder has submitted a bid or quote that conforms in all material respects to the specifications.

(B) Whether the bidder has submitted a bid that complies specifically with the invitation to bid and the instructions to bidders.

(C) Whether the bidder has complied with all applicable statutes, ordinances, resolutions, or rules pertaining to the award of a public contract."

I.C. §§ 36–1–12–4(8) & (10).[3] The purpose behind competitive bidding statutes is "to safeguard the public against fraud, favoritism, graft, extravagance, improvidence and corruption, and to insure honest competition for the best work or supplies at the lowest reasonable cost." *School City of Gary v. Continental Electric Co.* (1971), 149 Ind.App. 416, 273 N.E.2d 293, 296.

█ In order for a bid on a public work contract to be responsive, the bid must conform substantially to those specifications set forth in the invitation to bid. *Bowen Engineering Corp., supra,* 557 N.E.2d at 1364. A minor variance in a bid will not render the

bid invalid. *Id.* A material variance, however, requires that the awarding body reject the bid as unresponsive. *Id.* A material variance has been defined as a variance which "affords one bidder a substantial advantage not available to other bidders [and which] destroys the competitive character of the bidding process...." *Id.*

### *MBE/WBE Participation Requirements*

█ Schindler contends first that Montgomery's bid was unresponsive because Montgomery's bid failed to meet specified goals for MBE/WBE participation or to demonstrate a good faith effort toward achieving such goals. In response, the appellees argue that the trial court correctly determined that Montgomery had satisfied the bidding requirements by demonstrating its good faith effort. We agree with the appellees.

The Project Manual informed bidders that the Project was subject to MBE/WBE participation goals and that bids must include a completed schedule of MBE/WBE participation listing the MBE/WBE contractors that the bidder intended to use on the Project. Goals for MBE/WBE participation were set at 13% and 2% respectively. The instructions to bidders defined "goal" as "a project specific numerically expressed objective which contractors are required to meet, exceed, or show that they have made good faith efforts to achieve." Record, p. 2055. The instructions further provided that the schedule of MBE/WBE participation "must illustrate obtaining the goal ... or ... that good faith efforts were used to obtain the maximum MBE/WBE participation shown below the stated goal." Record, p. 2055b.

Montgomery's bid included a completed schedule of MBE/WBE participation on which Montgomery designated one MBE subcontractor. The schedule indicated an "agreed price" of $20,000 for the work to be performed by that subcontractor. Montgomery's schedule also included the following notation: " * See attached letter regarding MBE/WBE participation." Record, p. 2356. In the attached letter, Montgomery employ-

---

3. The term "board" is defined as "the board or officer of a political subdivision or agency having the power to award contracts for public work." I.C. § 36–1–12–2.

ee Mary Gelhaar discussed the Project's MBE/WBE requirements and described Montgomery's efforts to secure MBE/WBE subcontractors and to reach participation goals. Gelhaar indicated that because Montgomery manufactures and installs all of its own equipment, it was difficult for Montgomery to sub-contract work to MBE/WBE subcontractors. Gelhaar also wrote, however, that Montgomery had identified three methods of obtaining MBE/WBE participation, and that Gelhaar had sent a letter to every applicable MBE/WBE firm appearing on the list of certified MBE/WBE subcontractors provided by the DEO. Gelhaar indicated that copies of those letters were available if required, described the low level of response Montgomery received to its letter, and noted Gelhaar's successful negotiations with the MBE subcontractor listed on Montgomery's MBE/WBE participation schedule. Photocopies of Montgomery's letters seeking quotes on the three areas identified for MBE/WBE participation were admitted into evidence at trial; Montgomery sent its letter to numerous certified MBE/WBE firms.

Jim Crute of the DEO was responsible for the review and approval of MBE/WBE participation schedules. Crute testified that although the City attempts to obtain stated participation goals for MBE/WBE participation from bidding contractors, the City does not utilize "set asides" for such participation, and that a contractor either must meet the specified MBE/WBE participation goals or demonstrate a good faith effort to meet the goals.[4] Crute utilizes a set of nine standards in determining whether a contractor has shown a good faith effort to meet MBE/WBE participation goals. Those standards include:

"3. The provision of written notice to a reasonable number of specific MBE's and WBE's, done in suffi-

cient time to allow them to participate.

4. Follow-up by the low bidder with MBE/WBE's interested in participating.

5. The selection of portions of the work to be done by MBE/WBE's, including the division of contracts into economically-feasible units to facilitate participation.

6. The provision of adequate information about plans, specifications, and/or contracting requirements.

7. Negotiation in good faith by the low bidder with interested MBE/WBE's, with no MBE/WBE being rejected as unqualified without sound reason."

Record, p. 1437. Based on his application of the standards to Montgomery's schedule and his investigation of Montgomery's efforts to obtain MBE/WBE participation, Crute concluded that Montgomery had satisfied the bidding requirements by making a good faith effort to reach MBE/WBE participation goals prior to submitting its bid.

Schindler opens its argument on this issue by asserting that the MBE/WBE Schedule filed with Montgomery's bid clearly failed to meet the specified participation percentages, whereas Schindler's bid provided for more than fifteen percent MBE/WBE participation.[5] As noted by Montgomery, however, the applicable requirement is that a contract be awarded to the lowest responsible and responsive bidder. This standard sets a minimum threshold for responsiveness; it does not require, or authorize, a search for the "most" responsive bidder. See Bowen Engineering Corp., supra, 557 N.E.2d at 1366; I.C. § 36–1–12–4(b)(8)–(9). Similarly, the issue on appeal is not whether Montgomery met percentage goals for MBE/WBE participation, but whether the trial court

4. The parties all note that it would be unlawful for the City to include inflexible racial quotas in its bidding requirements, in lieu of the more flexible goal oriented, good faith requirements currently utilized, absent thorough research and documentation of the scope of prior discrimination against particular groups in the City's construction industry. See generally City of Richmond v. J.A. Croson Co. (1989), 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854.

5. Schindler's schedule of MBE/WBE participation listed two MBE subcontractors (including Construction Concepts) and two WBE subcontractors, with an "agreed price" of $434,000 for Construction Concepts' work. The trial court found, however, that only Construction Concepts' actual fee of five percent (approximately $20,000–$21,000) counted toward MBE/WBE participation goals.

erred in concluding that Montgomery had fulfilled the bidding requirements by making a good faith effort to engage MBE and WBE subcontractors.

The trial court found in pertinent part that "[t]he MBE/WBE goals for the Project were just that: goals"; that Gelhaar had solicited MBE/WBE participation through letters and phone calls, had followed up with all interested MBE/WBEs, had not rejected any MBE/WBE without reason, and had no bias against using minorities and women on the project; that Crute of the DEO had determined that Montgomery had made a good faith effort to achieve MBE/WBE participation goals prior to submitting its bid; and that Crute's determination of good faith on the part of Montgomery was consistent with the City's standards for making a determination of good faith. The trial court concluded that "Montgomery fulfilled the bidding requirements for MBE/WBE participation by making a good faith effort to engage MBE and WBE contractors and suppliers." Record, p. 511.

Schindler argues, however, that Montgomery's effort to achieve participation goals was inadequate as a matter of law. Schindler contends that Montgomery's effort did not constitute a good faith effort because Montgomery sought MBE/WBE participation for "only three narrow types of work" and even if MBE/WBE participation on all three items had been secured, participation levels "still would have been less than one-fourth of the amount needed to achieve the specified MBE/WBE participation percentages." Appellant's brief, pp. 25–26. Even if we assume that Schindler's quantitative analysis is accurate, we disagree that Montgomery's efforts were inadequate as a matter of law.

In support of its position, Schindler cites to *In re Appeal of Associated Sign & Post, Inc.* (1985), Ind.App., 485 N.E.2d 917, *Rossetti Contracting Co. v. Brennan* (7th Cir.1974), 508 F.2d 1039, and *Weiner v. Cuyahoga Community College District* (1969), 19 Ohio St.2d 35, 48 O.O.2d 48, 249 N.E.2d 907, *cert. denied*, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495. None of these cases, however, dealt with the question of MBE/WBE participation goals, involved an alternative "good faith effort" bidding requirement, or touched upon the point at which a municipality is required to determine that a bidder's pre-bid-opening efforts to achieve "goals" are so deficient as to be inadequate as a matter of law. The record supports the determination that Montgomery's pre-bid-opening attempts to obtain MBE/WBE participation constituted "a good faith effort" under the applicable bidding requirements and those standards utilized by the City in making such a determination.

Schindler also relies on *Associated Sign & Post* and *Rossetti* to support its contention that post-bid-opening changes to Montgomery's MBE/WBE schedule, which increased the level of MBE/WBE participation on the Project, were improper and ineffective to correct the "nonconforming status of the MBE/WBE Schedule filed on May 6, 1993." Appellant's brief, p. 26. As noted above, however, the City had a reasonable basis on which to determine, and did determine, that Montgomery's bid was responsive with regard to MBE/WBE requirements as of the bid-opening date.

The record reveals that although Crute had determined Montgomery's bid was responsive, he requested that Montgomery continue its attempts to increase MBE/WBE participation. As a result, Montgomery continued to solicit MBE/WBE contractors for work on the project, submitted a second schedule on May 17th, and a third schedule on May 25th, which Crute approved. On cross examination by defense counsel, Crute testified as follows:

"Q. And when you evaluate an MBE/WBE Participation Schedule for good faith, that's done as of the date the bid is submitted, looking backwards, isn't it?

A. That's right.

Q. So that if after the bid date, the day after, 10 days after or a month after the bid date, a bidder submits a second, a third or a thousand MBE/WBE revised schedules they have no bearing on whether or not they had good faith performance in fulfillment of the MBE/WBE participation as of the day of the bid?

A. That's right.

    \*    \*    \*    \*    \*    \*

Q. And after applying those standards and evaluating their [Montgomery's] participation schedule, the one submitted with their bid, what did you conclude?

A. That they had shown a good faith effort.

    \*    \*    \*    \*    \*    \*

Q. Now, if that's the case, why is it that you held their MBE/WBE Participation Schedule hostage and didn't approve it until June 1st?

A. We was [sic] trying to get more MBE participation out of the project.

Q. You're trying to turn the screws on them?

A. Right.

Q. But if they had came ... come back to you and said that they were going to give you no more participation that they were going to have no more minority participation or women owned business participation, other than what was shown on the initial schedule submitted with the bid ...

A. Um-hmm.

    \*    \*    \*    \*    \*    \*

Q. Would it have been approved by you?

A. Yes."

Record, pp. 1438–41. John Klipsch of the DMD testified that when a contractor works to increase MBE/WBE participation pursuant to the City's request, the contractor is not allowed to increase the contract amount.

*Associated Sign & Post* and *Rossetti* each stand for the proposition that a bidder may not make post-bid-opening changes to an unresponsive bid in order to make the bid responsive, and that a contrary rule would impair the competitive bidding process. *Associated Sign & Post*, 485 N.E.2d at 924–25;

*Rossetti Contracting Co.*, 508 F.2d at 1045–46.[6] The present case, however, does not involve post-bid-opening changes to an unresponsive bid. Instead, this case involves increasing MBE/WBE participation in connection with a responsive bid. Although post-bid-opening changes were made to Montgomery's MBE/WBE participation schedule, the changes did not, as Schindler contends, constitute an attempt to convert an unresponsive bid into a responsive bid.

Finally, Schindler asserts that Montgomery enjoyed an unfair advantage with regard to MBE/WBE bidding requirements because Crute informed Montgomery that the low bidder would be awarded the contract regardless of compliance with MBE/WBE goals as long as that bidder could show a good faith effort. Schindler then points to the testimony of its Branch Manager, Larry Rigsby. Rigsby testified that at the pre-bid meeting a representative of DeMars told the contractors in attendance that they should "pay particular attention to the MBE/WBE requirements," and that "the requirements were 13% for [MBE] and 2% for WBE and pretty well emphasized that the owners were going to be taking a hard look at that to be sure that you met the requirements." Record, pp. 593–95. We disagree with Schindler's contention that Montgomery gained an advantage over other bidders based upon information from Crute which was contained within the instructions received by all bidders: bidders could satisfy MBE/WBE requirements by achieving participation goals or by demonstrating a good faith effort to do so.

The record shows that the City had a valid basis on which to determine that Montgomery's bid satisfied MBE/WBE participation requirements as of the bid-opening date and that the City made such a determination under its established standards. The trial court did not err.

---

**6.** In the third case cited by Schindler, *Weiner, supra*, a divided supreme court of Ohio held that the capacity to assure compliance with anti-discrimination laws was a reasonable part of the standards for "a best or responsible bidder." 249 N.E.2d at 909. The court then held that the bidding requirements at issue did not seek a guarantee of results from bidders, but rather an assurance of equal employment opportunity. Finding that the unsuccessful lowest bidder, Reliance, offered only equivocal assurances, the court determined that Reliance's bid was lawfully rejected in favor of the second low bid. *Id.* at 910–11.

*Submission of an Affirmative Action Plan*

■ Schindler argues next that Montgomery's bid was not responsive because Montgomery did not submit a copy of its "own" affirmative action plan as required by the Project Manual. Appellant's brief, p. 27. Schindler's argument is without merit.

Section 1.2 of the instructions to bidders, "USE OF SEPARATE FORMS," lists thirteen items that all proposals "shall" include and designates the source for each item's form or document. With regard to affirmative action plans, Section 1.2 provides:

> "4. AFFIRMATIVE ACTION PLAN— Any Affirmative Action Plan submitted to the DIVISION OF EQUAL OPPORTUNITY must be approved by the Division. *Failure to comply will result in the bid being NON-RESPONSIVE.* (Provided by Bidding Contractor or Division of Equal Opportunity, City of Indianapolis)."

Record, p. 2055a (emphasis in original). The record reveals that Montgomery submitted an affirmative action plan with its bid on the form provided by the City's DEO.

In its brief, Schindler quotes paragraph four, but omits the parenthetical information appearing at the end of the paragraph. This language makes clear that a bidder may satisfy bidding requirements by submitting its affirmative action plan on a form the bidder provides or on the form provided by the City's DEO. The fact that Montgomery chose the latter option does not render its bid unresponsive.

Schindler also directs us to that portion of the Project Manual which advised bidders that they must comply with "Consolidated City of Indianapolis Mayor's Executive Order # 1, 1987." The City's "Equal Opportunity Compliance" form included Executive Order # 1, which set forth goals for MBE/WBE participation in contractual or purchasing opportunities with the City, and continued:

> "NOW THEREFORE, by virtue of the authority vested in me as Mayor of the City of Indianapolis, it is hereby ordered as follows:
>
>    \*    \*    \*    \*    \*    \*

(1.) Except as provided in (2) of this Part, all contracts, purchase orders, leases and bids awarded by the Central Purchasing Division of the Department of Administration in excess of an annual aggregate amount of Twenty–Five Thousand Dollars ($25,000) including but not limited to construction, materials and supplies, services, professional services, concessions and franchises, are required to execute the following covenant:

> 'Contractor certifies for itself and all its subcontractors compliance with existing laws of the State of Indiana and the United States regarding (a) prohibition of discrimination in employment practices on the basis of race, sex, handicap, religion, national origin, disabled veteran status and Vietnam-era veteran status; and (b) the utilization of Minority and Women Business Enterprises. Contractor further certifies that it (a) has formulated its own Affirmative Action Plan for the recruitment, training and employment of minorities and women, including goals and timetables; and (b) strongly encourages the use of small businesses, minority-owned businesses and women-owned businesses in its operations.'

---

Signature of Company Official

---

Title of Official

*If the contractor is bidding on a City contract, a copy of this covenant and the contractor's Affirmative Action Plan must be submitted with the bid package. Any Affirmative Action Plan submitted to the Division of Equal Opportunity must be approved by the Division. Failure to comply will result in the bid being non-responsive."*

Record, pp. 2068–68b (emphasis in original). Montgomery signed the required certification and submitted it along with its bid. Schindler cites the last paragraph of the quoted text above, however, as support for its argument that Montgomery's bid was not responsive because it did not include a copy of

Montgomery's "own" affirmative action plan. We disagree.

The equal opportunity compliance form required each bidder to sign a certification that, in essence, it did not engage in unlawful discrimination, that it had formulated its "own" affirmative action plan, and that it strongly encourages the use of small and MBE/WBE businesses. Montgomery complied with this requirement. The paragraph which appears subsequent to the certification requires that each bid include a copy of "the contractor's" affirmative action plan, which plan must be approved by the DEO. Schindler's argument amounts to a contention that when a contractor utilizes the plan form provided by the DEO, this does not satisfy bidding requirements because it is not the same as the bidder's "own" plan. Such an interpretation, however, renders meaningless the language found in Section 1.2 of the instructions to bidders, discussed above, which provides that a bidder may submit its affirmative action plan on a form provided by the bidder or that provided by the DEO.

Crute testified that the majority of bidders on City public work projects utilize the affirmative action plan form provided by the DEO. Crute further testified that he verified that Montgomery had submitted an affirmative action plan and Form CC09 dealing with equal employment opportunities with its bid. Gelhaar testified that once she filled out the City's affirmative action form and put Montgomery's information on it, she considered that plan to be Montgomery's plan, i.e., "the contractor's affirmative action plan." Record, p. 1137. Gelhaar also testified that no one from the City ever objected to the affirmative action plan submitted with Montgomery's bid.

As noted by Schindler, approximately two weeks after the bids were opened, pursuant to the City's request, Montgomery submitted a document entitled "Montgomery Elevator Company Indianapolis Branch Equal Employment Opportunity and Affirmative Action Plan" to the DEO. Record, pp. 1016–63. Contrary to Schindler's position, however, this submission does not indicate that Montgomery's bid was not responsive on May 6th.

The record reveals that on May 18, 1993, the DEO transmitted a request to Montgomery to submit an "Affirmative Action Plan—15 or more employees" within ten working days. The transmittal further stated that this information was needed "before temporary compliance can be issued." Record, p. 1008. In response, on May 20th, Gelhaar transmitted a copy of Montgomery's Indianapolis Branch EEO/AA policies and plans. On May 24th, the DEO sent a letter to Montgomery which provided, in pertinent part:

> "Based upon the Affirmative Action/Equal Employment Opportunity (AA/EEO) documents submitted by your company, you are hereby awarded Temporary Compliance Status for bidding on City of Indianapolis projects. *Submit a copy of this letter in lieu of the normally required AA/EEO compliance forms with each bid package.* Temporary compliance status is good for one calendar year, ..."

Record, p. 1011 (emphasis added). Thus, the responsiveness of Montgomery's bid as of May 6, 1993, was a matter separate from Montgomery obtaining "Temporary Compliance Status" for a one year period, thereby obviating the need to submit the normally required compliance forms with each bid package. In other words, the fact that Montgomery obtained temporary compliance status after May 6th does not change the fact that Montgomery had submitted the "normally required AA/EEO compliance forms" with its bid on May 6th.

The trial court correctly determined that Montgomery's bid was responsive to equal employment opportunity and affirmative action plan requirements as of the bid opening date.

### Submission of a Bid Bond

Schindler contends next that Montgomery's bid contained a material variance because Montgomery failed to submit a five percent bid bond as required by the invitation to bid. The appellees respond that the trial court correctly determined that the defect in the bid bond submitted with Montgomery's bid did not constitute a material variance. We agree with the appellees.

The instructions to bidders provided, in pertinent part:

"The bid must be accompanied by a Bid Guaranty *which shall not be less than five percent (5%) of the total amount of the bid,* ... All bidders submitting a bond for their bid security must use the standardized FORM 126. The Bid Bond shall be secured by guaranty or surety company. No bid will be considered unless it is accompanied by the required guaranty...."

Record, p. 2055c (emphasis added). The instructions provided that failure to submit "a completely and correctly executed bid surety in the correct amount" was immediate cause for rejection of a bid. Record, p. 2340. The instructions also stated, however, that "[the Commission] reserves the right ... to waive any informality in bids ... whenever such ... waiver is in its best interest." Record, p. 2057.

Montgomery submitted a bid bond with its bid using the standardized Form 126. The bid bond was signed by representatives of both Montgomery and Montgomery's surety, but the spaces for designation of the penal sum amount had been left blank. Upon observing the omission when the bids were opened, Evelyn Thompson, the public bid coordinator in Central Purchasing, contacted the City Legal Department for advice. City Legal informed Thompson that Montgomery's bid could be accepted despite the omission, and that Montgomery should be allowed to submit a new bid bond with the penal sum amount of five percent added to the bond form. On May 7th, Montgomery submitted a new bid bond which specified the penal sum amount of five percent of the total bid. Schindler contends that by failing to specify either the dollar or percentage amount of the bid bond, Montgomery failed to comply with the requirement that the bond be for at least five percent of the bid amount.

The trial court found that although Montgomery's original bid bond did not specify a penal sum, Montgomery was obligated under the bond for at least five percent, but no more than ten percent of the bid amount, and "although unnecessary to bind Montgomery and its surety, the City properly allowed Montgomery to submit an additional bid bond...." Record, p. 501. The trial court concluded that under Indiana law, the original bid bond was sufficient to bind Montgomery and its surety to at least five percent of the total bid amount, therefore the omission in Montgomery's original bid bond did not constitute a material variance.

Under Indiana law, bidders on public work projects are required to file with their bid a bond or certified check "in the amount determined and specified by the board in the notice of the letting," which amount may not exceed ten percent of the contract price. I.C. §§ 36–1–12–4.5(a) & (b). Where a bond is taken pursuant to statute, it is an "official bond." *State v. Neiswinger* (1988), Ind.App., 524 N.E.2d 21, 22 (citing *Southern Surety v. Kinney* (1920), 74 Ind.App. 205, 127 N.E. 575), *trans. denied.*

Defective official bonds are subject to cure under I.C. § 34–1–64–1, which provides:

"**Defective bond.**—No official bond entered into by any officer, nor any bond, recognizance or written undertaking, taken by any officer in the discharge of the duties of his office, shall be void for want of form or substance, or recital, or condition, nor the principal or surety be discharged; but the principal and surety shall be bound by such bond, recognizance or written undertaking, to the full extent contemplated by the law requiring the same, and the sureties to the amount specified in the bond or recognizance. In all actions on a defective bond, recognizance or written undertaking, the plaintiff or relator may suggest the defect in his complaint, and recover to the same extent as if such bond, recognizance or written undertaking, were perfect in all respects."

I.C. § 34–1–64–1. As our supreme court observed more than a century ago, "[t]he force and effect of this section is to cure defects and supply omissions in the class of bonds named, whether the defects and omissions be of form or substance, and to hold the obligors, both principals and sureties, to the full extent of the law requiring the bond." *Opp v. TenEyck* (1884), 99 Ind. 345, 348; *see also Stults v. Zahn* (1889), 117 Ind. 297, 298, 20 N.E. 154 ("the parties became bound to the full extent contemplated by the statute re-

quiring the bond"). This statute is applicable to official bonds executed in connection with the performance of public work. *See, e.g., Robling v. Board of Commissioners of Pike County* (1895), 141 Ind. 522, 40 N.E. 1079; *Faurote v. State ex rel. Gordon* (1887), 110 Ind. 463, 11 N.E. 472.

Schindler cites *Neiswinger, supra,* wherein this court held that I.C. § 34–1–64–1 did not cure the absence of execution of an official performance bond. Schindler argues that the absence of a signature on a bond is comparable to the absence of a specific percentage amount. We disagree.

In *Neiswinger,* at issue was the enforceability of a performance bond which had not been signed by the principal or the surety. 524 N.E.2d at 22. This court held that the bond could not be enforced against the surety because the applicable cure statutes did not speak to a lack of execution. The court wrote "[t]he rule that a party not signing or otherwise executing a bond cannot be held liable thereon is equally applicable to any bond, regardless of its nature." *Neiswinger,* 524 N.E.2d at 22.

Unlike the bond at issue in *Neiswinger,* the bond at issue in this case was signed by both the principal and the surety and was complete in all respects except specification of the penal sum amount. By executing and delivering the bond, Montgomery and its surety became liable on it, and the omitted information was supplied by operation of I.C. § 34–1–64–1; therefore the City could permit Montgomery to submit the second bond. *See Robling, supra,* 141 Ind. at 525–26; *see also Britton v. State ex rel. Rowe* (1888), 115 Ind. 55, 57, 17 N.E. 254 (defective guardian's bond was cured by statute, which provided that a guardian's bond "shall not be void on account of any informality, illegality, or defect, either formal or substantial," where space for designation of penal sum amount had been left blank). The trial court correctly concluded that the omission of the penal sum amount on the original bid bond did not constitute a material variance.

*Completion of the "Invitation to Bid" Form*

Lastly, Schindler contends that Montgomery's bid was non-responsive because there were material variances in Montgomery's bid amount reflected on Montgomery's "Invitation to Bid" (also referred to as the "Request for Bid" form) and Montgomery's "Itemized Proposal."

We address first Schindler's assertion that Montgomery's bid contained a material variance because its Itemized Proposal listed the numerical amount of "$2,399,000" whereas the amount was written out on the same form as "Two million three hundred ninety-nine dollars." Record, p. 2352. It is clear that the discrepancy between the numerical amount and the written amount was merely a typographical error. Additionally, the City followed the provisions in the Project Manual for resolving bid amount discrepancies. Section 1.18 of the instructions to bidders provided: "In the event of discrepancies [between] the total sum shown on the Itemized Proposal and the Invitation to Bid, the total sum shown on the Invitation to Bid will govern." Record, p. 2058. The Invitation to Bid submitted with Montgomery's bid listed a base bid amount of $2,399,000. The City properly determined Montgomery's base bid amount to be $2,399,000.

Next, we address Schindler's argument that the City and Montgomery improperly redefined the scope of the work and the amount of the contract for the Project after the bids were opened because Montgomery's base bid amount was $2,399,000 as of the bid opening date, but the contract was awarded in the amount of $3,092,300.

At the pre-bid meeting on April 27th, an addendum to the Project Manual ("Addendum No. 1") was issued. Addendum No. 1 included an "Alternate No. 1" for the installation of two feature elevators, as well as a revised itemized proposal sheet. Upon receiving Addendum No. 1, Gelhaar noticed that the new itemized proposal form showed the two feature elevators as a separate, alternate item. Gelhaar asked the DeMars representative, Dan Seib, whether the feature elevators should be excluded from the base bid amount. Although Rigsby may not have heard Seib's answer, Seib responded affirmatively.

Montgomery and Otis each listed the cost of Alternate No. 1 separate from the base bid

amounts in their respective bids. Montgomery's bid set the cost of Alternate No. 1 at $693,300. The difference between Montgomery's base bid amount and the contract amount simply reflects the City's decision to implement Alternate No. 1 ($2,399,000 base bid amount + $696,300 cost of Alternate No. 1 = $3,092,300 contract amount).

As noted above, when the bids were opened the base bid amounts read aloud for Montgomery and for Schindler were $2,399,000 and $3,338,000 respectively. The trial court found, and we agree, that Montgomery completed its bid forms as instructed, and that Schindler incorrectly included the cost of Alternate No. 1 in its base bid amount. Even after the subtraction of the cost of Alternate No. 1 from Schindler's base bid amount, Schindler still was not the lowest bidder. ($3,338,000 base bid amount − $727,693 cost for Alternate No. 1 = $2,610,307 adjusted base bid amount).

The trial court correctly concluded that there were no material variances associated with Montgomery's bid amount.

In summary, the trial court's conclusions that Montgomery's bid was a responsive bid when opened on May 6, 1993, that the award of the bid to Montgomery was not arbitrary, corrupt, or illegal, and that the defendants had not engaged in collusion or fraud are supported by the trial court's findings, and the findings are supported by evidence. Montgomery's bid substantially conformed to bidding requirements in all material respects, making Montgomery the lowest responsible and responsive bidder on the Project. The City and Commission acted within the law in awarding the Project contract to Montgomery.

Because we have concluded that the trial court did not err, we need not address Schindler's second issue concerning whether Schindler is entitled to damages under a theory of promissory estoppel.

The trial court's judgment is affirmed in all respects. AFFIRMED.

RUCKER and KIRSCH, JJ., concur.