**Patrick SHANNAHAN, Plaintiff,**

v.

**B.F. GOODRICH AEROSPACE CO., Landing Gear Division, Defendant.**

**No. 1:96–CV–993.**

United States District Court, N.D. Ohio, Eastern Division.

Jan. 6, 1998.

Michael Terrence Conway, Strongsville, OH, for Patrick Shannahan.

Stephen C. Sutton, Millisor & Nobil, Kenneth B. Stark, Duvin, Cahn & Hutton, Cleveland, OH, for B.F. Goodrich Aerospace Co., Landing Gear Division.

## MEMORANDUM OPINION AND ORDER

GWIN, District Judge.

On March 27, 1997, Defendant B.F. Goodrich Aerospace Landing Gear Division filed a motion for summary judgment [Doc. 29]. Plaintiff filed his response on July 3, 1997 [Doc. 41]. The Court decides whether Defendant is entitled to judgment as a matter of law. For the reasons that follow, Defendant's motion for summary judgment against Plaintiff is granted. There is no dispute as to the material facts. The following constitutes the Court's findings and conclusions pursuant to Fed.R.Civ.P. 52.

### I. Facts and Issues

In this case, Plaintiff makes claim against his former employer, Defendant B.F. Goodrich Aerospace Landing Gear Division. In his complaint, Plaintiff has alleged that (1) he was constructively discharged because of his Irish national origin in violation of Title VII of the Civil Rights Act of 1964; (2) he was wrongfully discharged in breach of a contract founded on a theory of promissory estoppel; and (3) he was defamed by Defendant by virtue of the distribution of signs published by an unknown person(s) identifying Plaintiff as an "Authentic Irishman."

### A. Facts

In May 1995, Plaintiff applied for employment as a maintenance supervisor with Defendant. The Plaintiff applied in response to an advertisement placed by Defendant in the Cleveland Plain Dealer.[1]

Thereafter, Plaintiff was interviewed on two occasions. During the first interview, Plaintiff met with three division managers: (1) Ernie Jones ("Jones"); (2) Ajit Patra ("Patra"); and (3) Dale Simpson ("Simpson"). In individual meetings with these men, Plaintiff discussed his qualifications for the position and completed an employment application. That application clearly advised Plaintiff of his right to voluntarily leave Defendant's employment at any time and, likewise, clearly advised Plaintiff of Defendant's corresponding right to terminate him at any time. The application said:

> I understand that this application and any other Company documents are not contracts of employment, and anyone who is hired may voluntarily leave employment, and may be terminated by the employer at any time and for any or no reason. I understand that any oral or written statements to the contrary are expressly disavowed.[2]

On June 7, 1995, Plaintiff met with Defendant's representatives for a second interview.[3] Following those interviews, Defendant B.F. Goodrich extended Plaintiff Shannahan an offer to work as a Second Shift Maintenance Supervisor. The Plaintiff accepted the offer. To confirm their understanding, Jones sent a letter confirming his acceptance. In that letter, Defendant verified that Plaintiff would receive an annual salary of $45,248.00 and again confirmed Plaintiff's at-will employment status by stating: "The quotation of salary is for convenience only and does not imply a commitment of employment for any specific period of time."[4] The Plaintiff began working on July 15, 1995, and reported directly to Patra, Manager of Facilities and Maintenance.

As a Second Shift Maintenance Supervisor, Plaintiff Shannahan's job duties included coordinating the repair of equipment with production supervisors, assisting in troubleshooting, and overseeing the preventive maintenance of Defendant's manufacturing equipment. The United Auto Workers Local 2333 represented the nine maintenance employees Plaintiff Shannahan supervised.

---

**1.** At the time he applied, Plaintiff was working at Industrial Plastics Inc., in Valley City, Ohio, as a maintenance supervisor. He had been attempting to leave Industrial Plastics for some time.

**2.** See Shannahan Dep. at 59–60, 63–66; Exhibit 4 at 3.

**3.** The June 7, 1995, meeting included Jones, and Patra, and Human Resource Director John Jordan ("Jordan"), as well as two other managers.

**4.** A review of the record suggests that at no time during the interviews did any division manager say anything remotely contrary to the notice of at-will employment contained in the application Plaintiff signed, nor has Plaintiff seen any document that abrogated his at-will employment status.

Plaintiff recognized that in a union environment, fostering positive labor relations was an important part of his job.[5]

In the first week of January 1996, Plaintiff scheduled the maintenance employees who would be working overtime on Sunday, January 7, 1996.[6] After Plaintiff made his selection of the employees to work on that day, Bob Williams ("Williams"), a first shift electrician approached Plaintiff to discuss the overtime assignment. According to Plaintiff, Williams requested that Plaintiff assign an additional first shift electrician to work Sunday overtime. In response, Plaintiff stated that he was authorized only to assign one electrician and that he was "tired of hearing [Williams] cry about the overtime, and that if he was upset about the decision that [Plaintiff] was limited to, then [Williams] should write a grievance." In turn, Williams insisted that Plaintiff adhere to the terms of the contract or else Williams would take the matter to higher management.

The conversation thereafter escalated to a hostile level. The Plaintiff admittedly states that he raised his voice and told Williams to "get out of [his] face and that he didn't give a "flying f—" about Williams' knowledge of the contract." Before leaving the maintenance area to return to his office, it appears that Plaintiff punctuated the conversation with additional vulgarities, including the statement to Williams that "instead of flopping your jaw, why don't you get up off your dead f— ass and write the grievance." Offended by Plaintiff's outburst, Williams informed Union officials of the incident.

On January 9, 1996, Local 2333 business representative Joe Cantale, Union steward Tom Leedham, and Williams met with Patra to complain about Plaintiff's conduct toward Williams. Thereafter, Patra met with Plaintiff to discuss the matter.[7] After their meeting, Patra informed Plaintiff that he would investigate the matter and get back to him.

On January 15, 1996, after completing his investigation, Patra again met with Plaintiff to discuss his findings, including informing Plaintiff that witnesses had heard him utter profanity.[8] Patra told Plaintiff that his use of profanity was unacceptable and that he was to change his management style when dealing with employees.

At the beginning of the first shift the next morning, January 16, 1996, Simpson discovered that several photocopied signs had been hung throughout the Maintenance Department. The signs were printed on $8\frac{1}{2}'' \times 11''$ paper and read as follows:

"Patrick Shannahan"

Authentic

Irish Man

For Hire

Story Telling & Singing

Dancing & Carrying On

Available All Hours

Experienced Drinking Companion.

Simpson immediately gathered up all of the signs in the department and showed a copy

---

5. As part of his ongoing development as a division manager, Plaintiff received training regarding his supervisory responsibilities in the area of employer-employee relations. On November 10, 1995, Plaintiff, along with other managers, participated in a day-long seminar presented by Defendant entitled "Human Relations and Supervisory Responsibilities." As part of that training, the subject of "shop-talk" was discussed. Specifically, the group discussed the fact that engaging in "shop talk" can contribute to potential workplace violence and to a hostile working environment. In the first two months after receiving this training, Plaintiff admittedly directed profanity at a union maintenance employee during a verbal exchange over an assignment of overtime. This exchange was the basis of what eventually led to the pending litigation.

6. Sunday overtime is coveted by the Union employees because it pays double-time under the Union contract.

7. During that meeting, Plaintiff apparently recounted his version of the events, acknowledging that he had told Williams to get off his "f___ dead ass."Plaintiff did not acknowledge uttering other profanity at Williams and he was apparently unable to recall whether he called Williams a "mother f___." During their meeting, Plaintiff also provided Patra with a list of Union employees who may have witnessed the exchange.

8. During the course of Patra's investigation, he spoke with several employees who confirmed the occurrence of the exchange between Plaintiff and Williams, specifically recalling that Plaintiff had directed profanity at Williams.

to Patra.[9]

Thereafter, Patra met with Human Resource Director Jordan to inform him of the discussion with Plaintiff the previous day and to show Jordan a copy of the sign. After some discussion, Patra concurred with Jordan's recommendation that Plaintiff should talk directly with Williams and apologize for directing profanity toward him. Later that afternoon, Patra again met with Plaintiff at which time Patra showed Plaintiff one of the signs that Simpson had collected. Patra stated that he believed that the signs represented an escalation of his altercation with Williams and then suggested to Plaintiff that he "express regrets" or apologize to Williams during a one-on-one meeting. The Plaintiff refused to do so. In response, Patra suggested that they together talk to Jordan.

The three men met in Human Resource Director Jordan's office that afternoon. There, Plaintiff described his version of the event to Jordan. In response, Jordan explained why Plaintiff's use of profanity was improper. The Plaintiff became upset, accusing Patra of undercutting his and fellow supervisors' authority. The Plaintiff then stated that Jordan and Patra were leaving him no choice but to quit. Jordan indicated that they did not want him to resign. Apparently "livid," Plaintiff exited the meeting to have a cigarette.

Shortly thereafter, Plaintiff returned and announced to Jordan and Patra that he had decided to quit, but that he would stay on until they found a replacement for him. In response, Jordan indicated that it was not necessary for Plaintiff to quit and suggested that they plan a further meeting to discuss the matter the following week. Although he was still not willing to apologize to Williams, Plaintiff agreed to meet further.

The next day, Human Resource Director Jordan met with Plaintiff. In this conversation, Jordan told Plaintiff that he had decided to except Plaintiff's resignation. He told Plaintiff that he would be paid through January 24, 1996.[10] Upon learning of Jordan's decision, Plaintiff "unloaded" on Jordan about Patra's management style. Thereafter, Jordan informed Plaintiff that the Benefits Manager would assist him in filling out the necessary paperwork in relation to his voluntary separation. This lawsuit was filed several months later.

## B. Issues

The court reviews three issues: (1) whether Defendant is entitled to summary judgment on Plaintiff's claim that he was constructively discharged from his employment due to Defendant's alleged discrimination on the basis of Plaintiff's Irish national origin; (2) whether Defendant is entitled to summary judgment on Plaintiff's claim of wrongful discharge as asserted under the theory of promissory estoppel; and (3) whether Defendant is entitled to summary judgment on Plaintiff's claim for defamation arising from the placement the "Authentic Irish Man" sign.

## II. Standard of Review

FED. R. CIV. P. 56(c), states the procedure for granting summary judgment. It says in part:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is not proper if there is a material dispute over the facts, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

**9.** "Authentic Irish Man" signs are routinely sold in magazines. (*See* Appendix Exhibit 6).

**10.** It appears from the record that Jordan decided to accept Plaintiff's resignation, although Plaintiff was not so informed until the next morning. Apparently Jordan decided to accept Plaintiff's resignation effective January 17, 1996 because Jordan knew that a retired manager was available to work in Plaintiff's place until a full-time replacement was hired. (Jordan Affidavit, Appendix Exhibit 5).

242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). See also *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit has recognized that *Liberty Lobby, Celotex* and *Matsushita* effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir.1989). In responding to a proper motion for summary judgment, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street,* 886 F.2d at 1479 (quoting *Liberty Lobby,* 477 U.S. at 257). The nonmoving party must introduce more than a scintilla of evidence to overcome the summary judgment motion. *Street,* 886 F.2d at 1479.[11] It is also not sufficient for the nonmoving party merely to "show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street,* 886 F.2d at 1479. That is, the nonmoving party has an affirmative duty to direct the court's attention to specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

This line of cases emphasizes the point that when one party moves for summary judgment, the nonmoving party must take affirmative steps to rebut the application of summary judgment. Courts have stated that:

> Under *Liberty Lobby* and *Celotex,* a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict, and if the opposing party is therefore unable to demonstrate that he can do so, summary judgment is appropriate. "In other words, the movant could challenge the opposing party to 'put up or shut up,' on a critical issue [and] . . . if the respondent did not 'put up,' summary judgment was proper."

*Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992) (quoting *Street,* 886 F.2d at 1478).

The Sixth Circuit further emphasized the showing required to defeat summary judgement in *Mitchell v. Toledo Hosp.,* 964 F.2d 577 (6th Cir.1992), stating:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict . . . The "mere possibility" of a factual dispute is not enough. Rather, in order to defeat summary judgment a plaintiff "must come forward with more persuasive evidence to support [his or her] claim than would otherwise be necessary." Where the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evi-

**11.** In *Anderson,* the Court described this:

> If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. . . . If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in

> support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202.

dence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted.

*Mitchell,* 964 F.2d at 581–82 (citations omitted).

## III. Discussion

### A. Discrimination Claim—National Origin

The Defendant argues that Plaintiff's claim for discrimination on the basis of Plaintiff's Irish national origin must fail as matter of law because Plaintiff is unable to meet the requisite elements to establish a *prima facie* case. Specifically, Defendant contends that Plaintiff's claim for discrimination should be dismissed because he voluntarily terminated his employment with Defendant and "was not constructively discharged." To support this argument, Defendant suggests that the incidents giving rise to Plaintiff's claim, culminating with the act of an unknown party placing "Authentic Irishman" signs in Plaintiff's department, did not subject Plaintiff to "working conditions that were so difficult or unpleasant that a reasonable person in Plaintiff's position would have felt compelled to resign." The Defendant also contends that there is no evidence to indicate that Defen-

dant could have reasonably foreseen that Plaintiff would elect to resign following the events of this case.

In response, Plaintiff says sufficient evidence exists to defeat summary judgment on his claim that he was constructively discharged on account of his ethnicity, in violation of Title VII[12] or Ohio Revised Code § 4112.02.[13] The Court disagrees.

Title VII prohibits discrimination against an employee on account of his national origin. In Ohio, similar provisions are outlined in § 4112.02, et seq.[14] Under either scheme, the most immediate method of establishing a claim of discrimination on the basis of national origin or ancestry is for a complaining party to provide direct evidence of discriminatory conduct by an employer.[15] Plaintiff makes no such showing.

After a review of the record as a whole, the Court concludes that Plaintiff has failed to provide any evidence of direct statements by Defendant showing its decision concerning Plaintiff's status was based in whole or part upon consideration of his national origin.[16] The only direct evidence that national origin was involved was that placement of the "Authentic Irishman" signs. But as to

**12.** Under 42 U.S.C. § 2000e–2(a)(1), it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin ...."

**13.** Under Ohio Revised Code § 4112.01(A), it is an unlawful discriminatory practice in the state for "any employer, because of ... national origin ... to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

**14.** Ohio uses the same standards employed in the review of cases under Title VII of the Civil Rights Act of 1964. *See Barker v. Scovill, Inc., Schrader Bellows Div.,* 6 Ohio St.3d 146, 451 N.E.2d 807 (1983). *See also Plumbers & Steamfitters Joint Apprent. Comm. v. Ohio Civ. Rights Comm'n,* 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981), holding:

> Ohio uses the same test. In previous cases, however, we have determined that federal case law interpreting Title VII of the Civil rights act of 1964, Section 2000e et seq., Title 42,

U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112. *State ex rel. Republic Steel v. Ohio Civ. Rights Comm'n,* 44 Ohio St.2d 178, 339 N.E.2d 658 (1975); *Weiner v. Cuyahoga Comm. College Dist.,* (1969), 19 Ohio St.2d 35, 249 N.E.2d 907, *cert. denied,* 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970).

**15.** "Direct evidence" is evidence which if believed, proves the fact without inference or presumption. *Burns v. Gadsden State Comm. College,* 908 F.2d 1512 (11th Cir.1990). If a party is able to show direct evidence of employment discrimination, the *McDonnell Douglas* formula is inapplicable. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *Terbovitz v. Fiscal Court of Adair Cnty., Ky.,* 825 F.2d 111 (6th Cir.1987); *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707 (6th Cir.1985), *cert. denied,* 490 U.S. 1064, 109 S.Ct. 2062, 104 L.Ed.2d 627 (1989).

**16.** *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 241, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**1114**

these, no management personnel participated in or condoned these signs. Moreover, no evidence shows that Defendant placed or allowed the signs. Absent such direct evidence of Defendant's discriminatory motivation, Plaintiff's must establish his case under the standard given by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In order to succeed under *McDonnell Douglas*, a complaining party must establish by a preponderance of the evidence, a *prima facie* case that their employer discriminated against him. This must be done by proving the following elements: (1) he was a member of a protected class; (2) he was terminated; (3) he was qualified for the position; and (4) he was replaced by someone outside of the protected class.[17] Once established, the *prima facie* case requires the employer to go forward with evidence of a nondiscriminatory intent. The *prima facie* case creates a refutable presumption that the "real reason" or motivation for the action taken was discriminatory.

Since the *prima facie* case creates a presumption of discrimination, if the employer fails to respond to the *prima facie* case and if the trier of fact believes the complaining party's *prima facie* evidence, then the complaining party will receive judgment. The

burden of persuasion at all times remains with the complaining party and only does the burden of production shifts to the employer. Furthermore, at no time does the employer need to persuade the trier of fact that "it was actually motivated by the proffered reasons."[18] Rather, the employer needs simply to articulate a reason for their action through the introduction of admissible evidence.[19] Once the employer provides an articulated basis for their conduct, the burden of production then shifts back to the complaining party, who then must persuade the trier of fact that the employer's articulated reason is a "pretext." To prove that employer's articulated reason is a pretext, the complaining party must show that employer's reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in Defendant's decision, that they were jointly insufficient to motivate the discharge.[20]

*McDonnell Douglas* requires Plaintiff to show that he was terminated. But here, Defendant B.F. Goodrich did not fire the Plaintiff. Instead, Plaintiff Shannahan quit. To establish an adverse employment decision, the Plaintiff must show that he was "constructively discharged."[21] If there was no constructive discharge, Plaintiff cannot recover for those losses directly attributable to

---

17. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

18. In *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Court explained this as follows:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiffs. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. the explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the de-

fendant thus serves simultaneously to met the plaintiff's *prima facie* case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

19. In *Burdine*, the Court wrote that the explanation must be "legally sufficient to justify a judgment for the defendant" if it were believed by the trier of fact.

20. *Maddox v. University of Tennessee*, 62 F.3d 843, 848 (6th Cir.1995) (citing *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 266 (6th Cir.1986), cert. denied, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987)).

21. Constructive discharge is, at least partially, a question of law and thus properly may be resolved through summary judgment. *Wheeler v. Southland Corp.*, 875 F.2d 1246 (6th Cir.1989); *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir.1987).

his voluntary decision to quit. Plaintiff has the burden to establish this.

■ In the Sixth Circuit, there is a two-part test used to determine whether an employee was constructively discharged. First, the employee must show that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 887 (6th Cir.1996). Second, the employee must show that the employer either intended to cause the employee to resign or could reasonably foresee that the act might have such an impact upon the employee.[22]

■ When an employee alleges that he was forced to resign, the employee's perception must be judged objectively without consideration of his undue sensitivities. *Henry v. Lennox Indus. Inc.*, 768 F.2d 746, 752 n. 3 (6th Cir.1985). Furthermore, the working conditions complained of must be extremely onerous before an employee reasonably is said to be "compelled to resign."[23] Thus, the Plaintiff here must show that an objectively reasonable person faced with those circumstances would likewise have resigned.

■ The Court finds no evidence showing that Plaintiff's working environment was so onerous to cause a reasonable person in the same or similar situation to resign due to these conditions. Moreover, Plaintiff shows no evidence that Defendant B.F. Goodrich or its agents were responsible for any work condition complained of. While Plaintiff complains of the placement of signs, he gives no evidence that Patra, Jordan, or any manager authorized or was otherwise responsible for the distribution of the signs. The Defendant remedied this situation by immediately removing the signs and investigating the incident to ensure that no other signs appeared.

Even more, the law in this Circuit requires Plaintiff to show "aggravating factors."[24] Here, Plaintiff Shannahan has provided no evidence of "aggravating factors" that would cause a reasonable person to resign.[25] Furthermore, a review of the record evidence that the circumstances of Plaintiff's employment at issue here are the result of a single isolated incident that is, otherwise, very uncommon to Defendant's workplace.[26]

The Plaintiff also fails to show evidence that Defendant B.F. Goodrich either intended to cause the employee to resign or could reasonably foresee that Plaintiff would resign. To the contrary, the B.F. Goodrich representatives were surprised by Plaintiff's resignation. Plaintiff gives no proof that "a reasonable employer would have foreseen that a reasonable employee ... would feel constructively discharged" under the circumstances in this case.[27]

---

**22.** *Henry*, 768 F.2d at 752. *See also Hixson v. Norfolk Southern Railway Co.*, 89 F.3d 834, 834 (6th Cir.1996) (Appendix Exhibit 7).

**23.** *See, e.g., Wheeler v. Southland Corp.*, 875 F.2d at 1250 (constructive discharge arose from regular and frequent sexual harassment including physical contact); *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982) (constructive discharge included a "continuous course" of uniquely long hours, sexual harassment, exclusion of salesperson from sales depot, and use as an "errand girl" for menial tasks).

**24.** *Hixson*, 89 F.3d at 834 (stating that "proof of discrimination alone is not a sufficient predicate for a finding of constructive discharge; there must be other aggravating factors."); *Yates v. Avco Corp.*, 819 F.2d at 637. *See also Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir.1993) (no constructive discharge despite evidence that supervisor called plaintiff and other Hispanic employees "wetbacks" and "Mexicans;" the employee attempted to complain about these statements only on one occasion and failed to exhaust internal grievance procedure).

**25.** Established law holds that "[p]art of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." *Bielert v. Northern Ohio Prop.*, 863 F.2d 47, 47 (6th Cir.1988) (Appendix Exhibit 8). *See also Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir.1996) (stating that "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *Id.* at 494 (citing *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir.1995)))

**26.** *See Thomas v. Hoyt, Brumm & Link, Inc.*, 910 F.Supp. 1280, 1290 (E.D.Mich.1994) ("It is well-settled that isolated incidents of racial epithets are not sufficient to establish a claim of race discrimination.").

**27.** *Wheeler*, 875 F.2d at 1249.

Finally, Plaintiff's claim fails because no evidence indicates that the posting of the "Authentic Irishman" signs caused Plaintiff to resign. Rather, the evidence indicates that Plaintiff resigned because he was asked to apologize to a subordinate for engaging in improper conduct.[28]

Because Plaintiff is unable to establish that he was "constructively discharged" by Defendant, and because Plaintiff has failed to show that his Irish heritage was the primary reason that Defendant accepted his resignation, Plaintiff's claim for discrimination on the basis of national origin fails as a matter of law.

### B. Claim for Wrongful Discharge— Promissory Estoppel

The Defendant says no evidence supports Plaintiff's claim for wrongful discharge based upon promissory estoppel. The Defendant points to Plaintiff's failure to show any specific evidence of a "promise of guaranteed employment for a specific duration of time." Furthermore, Defendant contends that Plaintiff is unable to establish the elements of reasonable and detrimental reliance necessary to support a promissory estoppel claim. The Court agrees.

First, the State of Ohio has only recently come to recognize a separate, actionable tort claim for "wrongful discharge." However, this tort is only used as an exception to the doctrine of employment-at-will where there exist egregious violations of public policy. *Painter v. Graley*, 70 Ohio St.3d 377, 384, 639 N.E.2d 51 (1994).[29] Such is not the case here. Similarly, the State of Ohio does not recognize a duty to act in good faith. *Mers*

*v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 105, 483 N.E.2d 150 (1985).

Second, the Supreme Court of Ohio has found, with little exception, that employment relationships are presumed to be "at-will" unless the parties have specifically agreed otherwise. *Id.* Specifically, the Court described this relationship as follows:

Generally speaking, a contract for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and a discharge without cause does not constitute a breach of such contract justifying recovery of damages. The same is true where the contract of hiring specifies no term of duration but fixes compensation at a certain amount per day, week, or month. Although not absolute, the above stated rule appears to be in the nature of a strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other. The presumption is grounded on a policy that it would otherwise be unreasonable for a man to bind himself permanently to a position, thus eliminating the possibility of later improving that position. Moreover, a contract of permanent employment is by its very nature indefinite, and thus any effort to interpret the duration of the contract and assess the amount of damages becomes difficult.[30]

28. *See McDonald v. Union Camp Corp.*, 898 F.2d at 1160 (6th Cir.1990) (stating that courts do not "review bad business decisions or question the soundness of an employer's judgment" as a means to show pretext).

29. In *Painter*, the Supreme Court of Ohio effectively overruled *Tulloh v. Goodyear Atomic Corp.*, 62 Ohio St.3d 541, 584 N.E.2d 729 (1992) by stating:

[A]n exception to the employment-at-will doctrine is justified where an employer has discharged his employee in contravention of a "sufficiently clear public policy." The existence of such a public policy may be discerned by the Ohio judiciary based on sources such as

the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law.

The Court further stated that recognizing an exception to the "traditional doctrine of employment-at-will should be recognized only where public policy alleged to have been violated is of equally serious import as the violation of a statute." The Court went on to state that "[f]ull development of the elements of the tort of wrongful discharge in violation of public policy in Ohio will result through litigation and resolution of future cases...." *Id.* at 384, 584 N.E.2d 729.

30. *Mers*, 19 Ohio St.3d at 102, n. 1 (quoting *Henkel v. Educ. Research Council*, 45 Ohio St.2d 249, 255, 344 N.E.2d 118 (1976)).

The Court in *Mers* further stated that "[u]nless otherwise agreed, either party to an oral employment-at-will agreement may terminate the employment relationship for any reason which is not contrary to law. This doctrine has been repeatedly followed by most jurisdictions, including Ohio, which has long recognized the right of employers to discharge employees at will."[31]

In Ohio, promissory estoppel is one of the few exceptions to the State's recognized presumption of at-will employment.[32] Successfully proving a promissory estoppel claim in the employment setting requires a complaining party to satisfy the following test: "The test in such cases is whether the employer should have reasonably expected its representation [as to conditions of employment] to be relied upon by its employee and, if so, whether the expected action of forbearance actually resulted and was detrimental to the employee." *Mers,* at 105, 483 N.E.2d 150.

In the case at the bar, Defendant argues that Plaintiff has failed to satisfy this test because Plaintiff cannot establish: (1) that he received a specific promise of continued employment; (2) that his reliance on any statements made to him was reasonable; and (3) that he detrimentally relied on any statements made by Defendant. See *Wing v. Anchor Media Ltd. of Texas,* 59 Ohio St.3d 108, 570 N.E.2d 1095 (1991). The Court agrees.

First, the employment application that Plaintiff signed and/or initialed at the time of his first interview with Defendant clearly set forth the terms and scope of each party's obligations concerning the duration of employment. Both termination by the employer as well as resignation by the employee were "at will." The application, signed and initialed by Plaintiff, states:

I understand that this application and any other Company documents are not contracts of employment, and anyone who is hired may voluntarily leave employment, and may be terminated by the employer at any time and for any or no reason. I understand that any oral or written statements to the contrary are expressly disavowed.

Second, Plaintiff has failed to bring forth any evidence to establish that Defendant at any time made a promise to employ Plaintiff for a specified period of time.[33] There are no such guarantees found in the record before us. Furthermore, Plaintiff testified that he understood his "at-will" status:[34]

Q: Did you understand that you could voluntarily leave BFGoodrich employment anytime you wanted to?

A: Yes.

Q: And you understood that the company could terminate you at any time for any reason as a salaried employee, correct?

A: Yes.

The condition of an "at will" employment arrangement could be no clearer.

Considering the factual circumstances outlined above, Plaintiff has failed to establish that (1) he received a promise from Defendant of continued employment, or (2) that he reasonably relied to his detriment on the implication that such a promise was made by Defendant. Absent such a showing, coupled with the fact that Plaintiff concedes that his employment relationship with Defendant was

---

**31.** *Mers,* 19 Ohio St.3d at 103 (citing as examples *Evely v. Carlon Co.,* 4 Ohio St.3d 163, 447 N.E.2d 1290 (1983); *Fawcett v. G.C. Murphy & Co.,* 46 Ohio St.2d 245, 348 N.E.2d 144 (1976); *Henkel v. Educational Research Council,* 45 Ohio St.2d 249, 344 N.E.2d 118 (1976); *La France Elec. Const. & Supply Co. v. Int'l Broth.of Elec.,* 108 Ohio St. 61, 140 N.E. 899 (1923)).

**32.** The Ohio Supreme Court turned to the Restatement of the Law 2d, Contracts (1973) § 90, which states as follows:

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Mers,* 19 Ohio St.3d at 104, 483 N.E.2d 150

**33.** *See Wing v. Anchor Media Ltd. of Texas,* 59 Ohio St.3d 108, 570 N.E.2d 1095 (1991) ("A promise of future benefits or opportunities without a specific promise of continued employment doe not support a promissory estoppel exception to the employment-at-will doctrine.") (quoting syllabus, ¶ 2).

**34.** *See* Shannahan Dep. at 61.

"at-will," Plaintiff's claim for wrongful discharge based upon a theory of promissory estoppel must fail as a matter of law.

### C. Claim for Defamation

Defendant lastly contends that Plaintiff's claim for defamation must also fail because no evidence shows that Defendant was the party responsible, either directly or under principals of *respondeat superior,* for "publishing" the signs found in Plaintiff's work area. The Court again agrees.

 In order to establish a claim for defamation in Ohio, the complaining party shoulders the burden of proving by clear and convincing evidence that the defendant made a false, defamatory statement of fact regarding the complaining party and that the defendant was at least negligent in publishing it. *Lansdowne v. Beacon Journal Pub. Co.,* 32 Ohio St.3d 176, 178–180, 512 N.E.2d 979 (1987).[35] Thus, the essential elements in successfully proving a defamation claim are (1) falsity, (2) publication, (3) defamation, (4) fault, and (5) injury.[36]

In the instant case, Plaintiff acknowledges that the "Authentic Irishman" sign was posted by an unknown party. Yet Plaintiff contends that Defendant is liable through the acts of its agents as the "publisher of the sign." See *Barge v. Jaber,* 831 F.Supp. 593 (S.D.Ohio 1993). Plaintiff further contends that Defendant's "unjust termination of Plaintiff in violation of Title VII amounted to ratification of the unknown publisher's conduct by [Defendant]." The Court disagrees.

 A claim for defamation requires specific and personalized liability. The actor must be identifiable, either individually, or as a class. The Supreme Court of Ohio has stated that a complaining party must establish "a publication to a third person for which the defendant is responsible." *Hahn v. Kotten,* 43 Ohio St.2d 237, 331 N.E.2d 713 (1975).

Here, Plaintiff gives no evidence that Defendant B.F. Goodrich was responsible for the posting. *Dorsey v. Morris,* 82 Ohio App.3d 176, 611 N.E.2d 509 (OhioApp. 9 Dist.1992) (stating that an employer is not ordinarily liable for intentional torts of employee performed outside of scope of employment.). It is well-established that in order for an employer to be liable under the doctrine of *respondeat superior,* the tort of the employee must be committed within the scope of employment. Moreover, where the tort is intentional, as in the case at bar, the behavior giving rise to the tort must be "calculated to facilitate or promote the business for which the servant was employed ...." *Byrd v. Faber,* 57 Ohio St.3d 56, 58, 565 N.E.2d 584 (1991).[37]

 Because Plaintiff Shannahan has failed to establish that the posting of the signs was within the scope of employment or promoted the business of Defendant B.F. Goodrich, and because proof of publication is an element essential to a successful claim for defamation, Plaintiff's claim fails.

For the reasons set forth above, Defendant's motion for summary judgment is granted.

IT IS SO ORDERED.

---

**35.** *See also Ashcroft v. Mt. Sinai Med. Ctr.,* 68 Ohio App.3d 359, 588 N.E.2d 280 (OhioApp. 8th Dist.1990).

**36.** A defamatory communication is a publication that tends to harm the reputation of another. The reputation of another is harmed when the publication lowers the community's estimation of that person or when it deters third parties from associating or dealing with that person. *North Coast Cable L.P. v. Hanneman,* 98 Ohio App.3d 434, 442, 648 N.E.2d 875 (OhioApp. 8th Dist.1994).

**37.** *See also Little Miami RR. Co. v. Wetmore,* 19 Ohio St. 110, 132 (1869); *Taylor v. Doctors Hosp.,* 21 Ohio App.3d 154, 486 N.E.2d 1249 (OhioApp. 10th Dist.1985).